IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

DARRYL S. LADDIN, as Trustee of
the ETS Creditors' Litigation Trust,

   Plaintiff,

   v.

CHARLES EDWARDS, et al.,

   Defendants.

CIVIL ACTION FILE
NO. 1:02-CV-3327-TWT

OPINION AND ORDER

     This is an action for breach of fiduciary duty. It is before the Court on the Plaintiff's Motion for Partial Summary Judgment [Doc. 268] and the Defendants Sheldon E. Friedman, H. Michael Dever, and Friedman, Dever & Merlin, LLC's Motion for Summary Judgment [Doc. 270]. For the reasons set forth below, the Plaintiff's motion is DENIED and the Defendants' motion is GRANTED.

I. BACKGROUND

     ETS Payphones, Inc. ("ETS") was a Georgia corporation founded by Charles E. Edwards in October 1994. Edwards was the sole shareholder and owner of ETS. ETS promoted and marketed the sale and leaseback of coin-operated telephones as investment opportunities to individuals. An investor would pay a fixed sum to

purchase a telephone, and ETS would lease the telephone back from the investor for a preset fee. ETS advertised a 14 or 15% return on telephone leaseback investments. Further, ETS promised to repurchase the equipment at the end of the lease period or upon 180 days notice, making the investment an ostensibly low risk proposition. Thousands of individuals invested in ETS' leaseback program.

Unfortunately for these investors, the financial condition of ETS was less robust than its sales literature may have suggested. ETS consistently lost money on its telephone operations. As revenue from payphone operations consistently failed to cover ETS' operating expenses and lease payments, ETS needed to keep attracting new investors to meet its obligations to existing investors. In a previous order, the Court determined that the company's operations constituted a Ponzi scheme. (Order of 2/16/05, at 11.)

Not everyone lost money in ETS' payphone venture. Charles Edwards operated the leaseback program to his great personal profit. Edwards received $2.24 million in compensation from ETS and Twinleaf, Inc. between 1998 and 2000. From November 1998 through March 1999, ETS paid $3 million in management fees to an affiliated company owned by Edwards. ETS also made over $11 million in interest-free loans to companies controlled by Edwards.

On September 11, 2000, ETS filed for bankruptcy. Pursuant to a Stipulation and Agreed Order Concerning the Investigation of Certain of the Debtors' Claims dated December 7, 2000, the United States Bankruptcy Court for the District of Delaware authorized an Official Committee of Unsecured Creditors ("Creditors' Committee") to assert claims on behalf of ETS and certain affiliates ("Debtors"). In accordance with this Order, the Debtors and the Creditors' Committee created the ETS Creditors' Litigation Trust. They appointed a trustee, Plaintiff Darryl S. Laddin, to assert claims on their behalf.

Having settled ETS's claims against Charles Edwards and several corporate defendants, the Plaintiff also asserted claims against numerous others who were involved in some way in the rise and fall of ETS. Included among them are Defendants Sheldon E. Friedman, H. Michael Dever, and the law firm of Friedman, Dever & Merlin, LLC ("FDM"). The Plaintiff has alleged that these Defendants: (1) aided and abetted Edwards in breaching his fiduciary duty to ETS; (2) breached their own fiduciary duty to ETS; (3) received property from ETS by fraudulent transfer or unlawful preference; and (4) were unjustly enriched by these transfers, thus creating a constructive trust in this property. The Defendants have filed a motion for summary judgment as to all claims. The Plaintiff has filed a motion for partial summary judgment as to the avoidable preference claim.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only when the pleadings, depositions, and affidavits submitted by the parties show that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The court should view the evidence and any inferences that may be drawn in the light most favorable to the nonmovant. Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59 (1970). The party seeking summary judgment must first identify grounds that show the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986). The burden then shifts to the nonmovant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact does exist. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986).

## III. DISCUSSION

### A.   Aiding and Abetting Edwards's Breach of Fiduciary Duty

The Plaintiff's First and Second Claims for relief allege that the Defendants aided ETS's CEO Charles Edwards in breaching his fiduciary duty to ETS. This Court has already ruled, however, that the defense of *in pari delicto* applies against the Plaintiff in bringing an aiding and abetting claim against any defendant. This equitable doctrine provides that "a plaintiff who has participated in wrongdoing may not recover damages resulting from the wrongdoing," Black's Law Dictionary 806-07

(8th ed. 2004). The doctrine prevents a plaintiff from recovering on claims for which the plaintiff bears fault equal to or greater than that of the defendant. Here, the Court has previously determined that Edwards's knowledge and conduct in the payphone Ponzi scheme shall be imputed to ETS. The Court further concluded that the Plaintiff Trustee stands in the shoes of the debtor with regard to both causes of action belonging to the debtor and any defenses that could have been raised against it. Thus, the doctrine of *in pari delicto* prevents the Plaintiff from bringing this cause of action against the Defendants.

The Plaintiff appealed that Order to the Court of Appeals for the Eleventh Circuit which affirmed. "If a claim of ETS would have been subject to the defense of in pari delicto at the commencement of the bankruptcy, then the same claim, when asserted by the trustee, is subject to the same affirmative defense." Official Committee of Unsecured Creditors of PSA, Inc. v. Edwards, 437 F.3d 1145, 1150 (11th Cir. 2006). The Court of Appeals also held that "Georgia courts have not recognized a cause of action for aiding and abetting a breach of fiduciary duties." Id. at 1157. The Court can say with some confidence that the Defendants are entitled to summary judgment on this claim.

    B.    <u>Defendants' Breach of Fiduciary Duty</u>

The Plaintiff claims that Defendants Friedman and FDM violated their fiduciary duty to the debtor both generally by failing to act in ETS's best interest and specifically in regard to ETS's acquisition of Phoenix Telecom, LLC ("Phoenix"). An attorney's fiduciary duty to his client requires the attorney "to show loyalty, to exercise the utmost good faith, to apply his best skill, zeal, and diligence in representing him, and to avoid interests or actions that [are] incompatible with [the client's]." Tunsil v. Jackson, 248 Ga. App. 496, 499 (2001). In exercising good faith, the attorney must disclose to his client all material facts regarding the client's case. Id. However, "[w]hether and to what extent a lawyer has a fiduciary duty to a client depends on the facts in each case." Tante v. Herring, 264 Ga. 694, 696 n.4 (1994). Moreover, in order to bring a claim for breach of fiduciary duty, a plaintiff must show that the attorney's breach was the proximate cause of the plaintiff's injury. Rogers v. Norvell, 174 Ga. App. 453, 459 (1985).[1]

Here, the Plaintiff makes two fiduciary duty claims against the Defendants. He first alleges that Friedman acted as ETS's outside general counsel, thus placing on him a heightened duty to advise ETS in a manner consistent with the company's best interest. However, the record does not support the contention that Friedman was outside general counsel. The evidence demonstrates only that Friedman provided

---

[1]Curiously, the Defendants do not assert the in pari delicto defense to this claim.

legal services to ETS in many different areas from 1995 through 2000, that he was quarterbacking the Pennsylvania securities investigation against ETS, and that FDM was considered by ETS's in-house counsel, Joel Geer, as the "'go to' law firm for state securities matter." (Pl.'s Resp. to Defs.' Mot. for Summ. J., at 24.) The Plaintiff also offers the testimony of Mario Commito, one of ETS's financial officers. Commito stated that he was told by Edwards that Friedman had given legal advice suggesting that as long as ETS acquired a physical phone for each sales contract, the company had fulfilled its obligation even though the phone was not on location. (Commito Dep. at 77.) This evidence, however, is inadmissible hearsay and thus cannot be considered. See Fed. R. Evid. 801(c). Moreover, Friedman explained in his own deposition that while he recommended to ETS that all phones be identified with serial numbers, he never advised them to delete the location in the contract. (Friedman Dep. 187-88.) Friedman had a duty to give appropriate legal advice only about the matters with which he was involved. This Court determines that he fulfilled that duty.

Moreover, the Plaintiff offers very little in support of its contention that Friedman had explicit knowledge of Edwards's Ponzi scheme. His central piece of evidence involves a meeting in October, 1999 at the offices of ETS's accounting firm, Grant Thornton. According to one of ETS's chief financial officers, Walter Kaudelka,

7

it was discovered at this meeting that ETS was sustaining cash flow by selling payphones that did not exist.  (Pl.'s Resp. to Defs.' Mot. for Summ. J., at 25.) However, the record does not establish whether Friedman was even at the meeting. Kaudelka testified only that he "believed" that Friedman was there.  (Id.)  To prove his attendance, the Plaintiff cites to a portion of Friedman's testimony where he discusses a meeting that took place between him, Charles Edwards, and Andre Schnabl.  (Friedman's Dep. at 204-05.)  A cursory examination of this testimony reveals, however, that it discusses a completely different meeting that took place nine months earlier in January, 1999 at Friedman's office, not at Grant Thornton's.  The Court finds that the record does not support the Plaintiff's allegation that Friedman served as general counsel or that he had explicit knowledge of the Ponzi scheme. Thus, Friedman breached no general fiduciary duty to ETS.

      The Plaintiff also alleges that the Defendants had a specific duty to warn ETS against the acquisition of another payphone company, Phoenix, and to withdraw from the transaction because Dever also represented Phoenix and knew about an SEC investigation involving it.  It is undisputed, however, that Edwards knew about Dever's simultaneous representation of the acquired company.  (Defs.' Mot. for Summ. J., Ex. H.)  Moreover, the testimony of ETS executives clearly demonstrates Edwards's ultimate decision-making authority within the company and shows that he

8

was intractable in his determination to complete this acquisition. (Geer Dep. at 159-160; Blyth Dep. at 233; Kaudelka Dep. at 145; Commito Dep. at 34-35.) The acquisition was set to go forward even though ETS's CEO and acting president, James Blyth, knew at that time of several state enforcement actions against Phoenix. (Blyth Dep. at 45-46.) Indeed, the Phoenix acquisition was of such certainty that ETS's in-house counsel, Joel Geer, testified that the deal would have gone forward even it was discovered that Phoenix's back office was "filled with dead bodies." (Geer Dep. at 122.) Given these circumstances, the Court finds the Plaintiff has failed to demonstrate that this alleged breach was the proximate cause of any injury. The Defendants' motion for summary judgment on this fiduciary duty claim is therefore granted.

    C.    <u>Fraudulent Transfer or Preference Claims</u>

        1.    <u>Fraudulent Transfers Under 11 U.S.C. § 548</u>

The Bankruptcy Code provides that where a debtor makes a transfer of any interest in its property within one year of filing bankruptcy, a trustee may avoid that transfer in either of the following situations: (1) the debtor makes the transfer with the intent "to hinder, delay, or defraud any entity to which the debtor was...indebted"; or (2) the debtor "received less than reasonably equivalent value in exchange for such

transfer," and the debtor was insolvent at the time of the transfer. 11 U.S.C. § 548(a)(1). The Plaintiff makes claims under each of these provisions.

### a. Fraudulent Intent under Section 548(a)(1)(A)

The Eleventh Circuit has stated that fraudulent intent under section 548 may be inferred from "the circumstantial evidence and the surrounding circumstances of the transactions." In re XYZ Options, Inc., 154 F.3d 1262, 1271 (11th Cir. 1998). In making this determination, a court should look for certain "badges of fraud," which include: (1) the transfer was to an insider; (2) the debtor retained possession or control of the property transferred after the transfer; (3) the transfer was of substantially all the debtor's assets; (4) the debtor removed or concealed assets; (5) the debtor was insolvent or became insolvent shortly after the transfer was made; (6) the transfer occurred shortly before or shortly after a substantial debt was incurred; (7) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor. Id. at 1272. While no one badge is sufficient to establish fraudulent intent, "the confluence of several can constitute conclusive evidence of an actual intent to defraud." Id. at 1273 n.17. Unless conclusive evidence of these badges exists, the trustee bears the burden of proving the debtor's fraudulent intent. In re Triple S Restaurants, Inc., 422 F.3d 405, 414 (6th Cir. 2005).

Here, the Plaintiff alleges the existence of only a few of these badges of fraud. The record first demonstrates that both ETS's CEO and its in-house counsel believed that the company had received reasonable value for the Defendants' legal services. (Blyth Dep. at 220; Geer Dep. at 47.) The only other factors for which the Plaintiff has produced any evidence are Friedman's insider status and the debtor's insolvency around the time of the transfer. As to the first, a party becomes an insider by either meeting the statutory definition or through his relationship with the debtor. In re Enterprise Acquisition Partners, Inc., 319 B.R. 626, 631 (B.A.P. 9th Cir. 2004); In re Missionary Baptist Found. of Am., Inc., 712 F.2d 206, 210 (5th Cir. 1983). "Attorneys are not automatically considered to be insiders under the Code." In re Lemanski, 56 B.R. 981, 983 (Bankr. W.D. Wis. 1986). According to the Bankruptcy Code, an "insider" of a corporate debtor includes: (1) a director of the debtor; (2) an officer of the debtor; (3) a person in control of the debtor; (4) a partnership in which the debtor is a general partner; (5) a general partner of the debtor; or (6) a relative of a general partner, director, officer, or person in control of the debtor.

11 U.S.C. § 101 (31)(B)(i-vi). The Plaintiff alleges that Friedman held control over ETS. However, in order to be a "person in control of the debtor," mere financial power over the debtor is insufficient. In re Sullivan Haas Coyle, Inc., 208 B.R. 239, 243 (Bankr. N.D. Ga. 1997). The Court must determine that Friedman held such a

high degree of control that he had the opportunity "to self-deal or exert more control than is available to other unsecured creditors." Id. This is demonstrated not merely through personal relationships between the parties nor by the creditor's demonstrated knowledge of the debtor's business operations and financial condition. Indeed, the Plaintiff must show that Friedman held a "stranglehold" over ETS such that the company was not free to act independently. Id. Here, the evidence demonstrates that the important decisions regarding the direction of ETS were made predominantly by its founder, Charles Edwards. Although ETS enlisted the legal services of Friedman and his firm, there is no evidence that either exerted any control over the company's decision-making.

The Bankruptcy Code's use of the term "includes," however, indicates that this list of per se insiders is non-exhaustive. The legislative history of this law demonstrates that an insider can be anyone with a sufficiently close relationship to the debtor. See, e.g., Sullivan Haas Coyly, 208 B.R. at 244. To determine if such a relationship exists, the Court must examine the closeness of the parties and "whether the transactions between the debtor and the defendant were conducted at arm's length." Id.; In re Krehl, 86 F.3d 737, 742 (7th Cir. 1996); In re Holloway, 955 F.2d 1008, 1011 (5th Cir. 1992); In re A. Tarricone, Inc., 286 B.R. 256, 262 (Bankr. S.D.N.Y. 2002). This analysis is considered fact-intensive and should be done on a

case-by-case basis. Sullivan Haas Coyly, 208 B.R. at 242; In re A. Tarricone, Inc., 286 B.R. at 262. Where the evidence demonstrates a close relationship between the parties, a court must look with careful scrutiny at the subject transactions. Holloway, 955 F.2d at 1012. Non-arm's length transactions can be demonstrated by unsecured loans to the debtor, the creditor's clear knowledge of insolvency, and the creditor's lack of commercial motivation for the transactions. Id. However, even a showing that the debtor and the creditor are close personal friends, that the creditor solicited the debtor's business, and that the creditor and the debtor took vacations together does not necessarily demonstrate an insider relationship. See In re Friedman, 126 B.R. 63, 70 (9th Cir. 1991) (citing In re Hulzar, 71 B.R. 826 (Bankr. W.D. Tex. 1987)).

The Court finds that the evidence does not demonstrate Friedman's insider status. The Plaintiff's only proof in this regard is that: (1) Friedman paid a stay bonus to ETS's CEO as well as some of ETS's legal fees out of his firm's account; (2) Friedman provided extensive legal services to ETS from 1995 to 2000; and (3) Friedman also represented another company owned by Edwards and members of the Edwards family in other legal proceedings. This alone does not show a close relationship under relevant case authority, much less that Friedman was conducting transactions at less than arm's length. See Friedman, 126 B.R. at 70. In fact, the Plaintiff's proffered evidence fails to demonstrate anything more than an extensive

13

professional relationship between Friedman and ETS that continued over the course of several years.

The other potential badge of fraud is whether ETS was insolvent at the time it transferred payments to the Defendants. Insolvency is established where "the sum of the such entity's debts is greater than all of such entity's property." 11 U.S.C. § 101(32)(A). A debtor is presumed to be insolvent during the 90 days prior to its filing for bankruptcy. 11 U.S.C. § 547(f). The effect of this presumption is to shift to the transferee the burden of providing some evidence of solvency <u>as of the transfer date</u>. <u>In re Ramba, Inc.</u>, 416 F.3d 394, 403 (5th Cir. 2005); <u>Clay v. Traders Bank of Kansas City</u>, 708 F.2d 1347, 1351 (8th Cir. 1983).

Here, ETS made six payments to the Defendants between July 27, 2000, and September 11, 2000, the last of which occurred on the day that ETS filed for bankruptcy. (Pl.'s Mot. for Partial Summ. J., at 11.) To rebut the presumption of ETS's insolvency, the Defendants have presented an ETS balance sheet for the six month period ending June 30, 2000, which shows that the debtor was operating at a profit during this time period. (Defs.' Resp. to Pl.'s Mot. for Partial Summ. J., Ex. A.) However, each of the transfer payments made to the Defendants is dated almost a month or more after the time period covered by the balance sheet. Thus, this evidence does not demonstrate ETS's solvency as of the transfer date. The Defendants also

14

submit the affidavit of Bill Shearer, an attorney with the law firm that filed ETS's bankruptcy petition. Mr. Shearer, however, merely states that he previously testified at the trial of Charles Edwards that he was told ETS was paying its bills and could pay its bills. (Defs.' Resp. to Pl.'s Mot. for Partial Summ J., Ex. D.) This statement is inadmissible hearsay and thus cannot be considered. See Fed. R. Evid. 801(c).

The evidence shows, moreover, that ETS was using revenues generated by its new payphone sales to make monthly lease payments to current payphone owners. (Pl.'s Resp. to Defs.' Mot. for Summ. J., Ex. C). As previously stated by this Court, this demonstrates that ETS was operating a Ponzi scheme.[2] Such an enterprise "is insolvent from its inception and becomes increasingly insolvent as the scheme progresses." In re Rodriguez, 209 B. R. 424, 432 (Bankr. S.D. Tex. 1997); In re Taubman, 160 B. R. 964, 978 (Bankr. S.D. Ohio 1993) (citing Cunningham v. Brown, 265 U.S. 1, 7 (1924)). Based on this evidence, the Court finds that the debtor was insolvent at the time of these transfers. But considering the totality of the circumstances, this one factor is not enough to create an issue of fact as to actual

---

[2]"A ponzi scheme is a scheme whereby a corporation operates and continues to operate at a loss. The corporation gives the appearance of being profitable by obtaining new investors and using those investments to pay for the high premiums promised to earlier investors. The effect of such a scheme is to put the corporation farther and farther into debt by incurring more and more liability and to give the corporation the false appearance of profitability in order to obtain new investors." Hirsch v. Arthur Andersen & Co., 72 F.3d 1085, 1088 n.3 (2d Cir. 1995).

fraudulent intent. The Plaintiff has shown nothing more than routine payment of fees to legal counsel. Such payments – even by an insolvent corporation – are not fraudulent transfers.

        b.      Reasonably Equivalent Value Under Section 548(a)(1)(B)

Under 11 U.S.C. § 548(a)(1)(B), a Plaintiff must demonstrate by a preponderance of the evidence that the debtor received less than reasonably equivalent value for the transfer. In re Metro Shippers, Inc., 78 B.R. 747, 753 (Bankr. E.D. Pa. 1987). As determined above, the Defendants have shown that ETS received reasonably equivalent value for these payments. The Plaintiff has failed to present any evidence in rebuttal. Summary judgment for the Defendants is thus warranted.

        2.      Fraudulent Transfers Under 11 U.S.C. § 544(b)

11 U.S.C. § 544(b) provides that the trustee may avoid any transfer that is voidable under applicable law. The Plaintiff thus cites to O.C.G.A. § 18-2-22(2) & (3)[3] as grounds to set aside these transfers. To prevail under O.C.G.A. § 18-2-22(2), the trustee must prove that each payment to FDM during the four year period prior to bankruptcy was: (1) made with the intent to delay or defraud creditors; and (2) the

---

[3]Although O.C.G.A. § 18-2-22 was repealed in 2002, the Eleventh Circuit has held that claims which vested prior to enactment of Uniform Fraudulent Transfers Act, codified at O.C.G.A. § 18-2-70 to § 18-2-80, are substantive claims which may be pursued under the former law. Chepstow Ltd. v. Hunt, 381 F.3d 1077, 1087 (11th Cir. 2004).

Defendants knew that payments were made for such purpose. As set forth above, the Court holds that no payment was made with intent to delay or defraud creditors. Claims under O.C.G.A. § 18-2-22(3) require proof that the debtor did not give valuable consideration and the debtor was insolvent. Again, as determined previously, the Court concludes that valuable consideration was given. Thus, summary judgment for the Defendants is merited on these claims.

### 3. Preferences Under 11 U.S.C. § 547

Both parties have filed motions for summary judgment on the Plaintiff's claim that preferential payments were made to the Defendants. To prevail on a claim brought under 11 U.S.C. § 547(b), the trustee must show:

> (1) Payment of money to the Defendants for the benefit of ETS; (2) That the payment was made on account of an antecedent debt owed by ETS before such transfer was made; (3) That the payment was made while the debtor was insolvent; (4) That the payment was made either (a) within 90 days before the date of the filing of the petition; or (b) between ninety days and one year before the date of the filing, if any of the Defendants were insiders at the time of such transfer; and (5) that the Defendants received more than they would have received if there had been an equal distribution to creditors of similar status.

This Court has already determined that the FDM Defendants were not insiders. Thus, under section 547(b)(4), the Plaintiff may pursue this claim only for payments made within 90 days of the filing date.

In his Motion for Partial Summary Judgment, the Plaintiff states that payments totaling $184,500.00 were made to the Defendants between July 27, 2000, and the day ETS declared bankruptcy. Thus, he asserts that the payments are preferences under section 547(b)(4). The problem, however, is that no such claim is asserted in the Third Amended Complaint. In his Eighth Claim for Relief, the Plaintiff sought to void preferential payments made to insiders in the year prior to the bankruptcy filing date. (Third Amended Complaint, ¶¶ 194-199.) The FDM Defendants were not put on notice that the Plaintiff would seek to avoid preferences other than those based upon FDM's alleged status as insiders. Such a claim cannot be raised for the first time in a motion for partial summary judgment.

### 4. Recovery Under 11 U.S.C. § 550

11 U.S.C. § 550 permits a trustee to recover money or property from both the initial and the ultimate transferee. In order to make such a recovery, however, the Plaintiff must show a valid claim under either 11 U.S.C. §§ 544, 545, 548, 549, 553, or 574(a). The Court has already ruled, however, that no genuine issue exists as to the Plaintiff's claims under 544 and 548, and the Plaintiff has asserted no viable claims under the other statutory provisions. Thus, summary judgment for the Defendants is warranted on this claim.

### D. Constructive Trust Claim

The Plaintiff's final claim is that by fraudulently accepting transfers, the Defendants have unjustly enriched themselves, creating a constructive trust in the property received.  "A constructive trust is a trust 'implied whenever the circumstances are such that the person holding legal title to property, either from fraud or otherwise, cannot enjoy the beneficial interest in the property without violating some established principle of equity.'"  Total Supply, Inc. v. Pridgen, 267 Ga. App. 125, 126 (2004).  A constructive trust will not be established, however, where there is no evidence to demonstrate the property recipient's knowledge of a fraud.  Atlanta Classic Cars, Inc. v. Chih Hung USA Auto Corp., 209 Ga. App. 908, 910 (1993).  As discussed above, the evidence demonstrates that ETS received reasonably equivalent value in return for these payments and that the payments were not fraudulent transfers.  Thus, summary judgment for the Defendants on this claim is justified.

## IV. CONCLUSION

For the reasons set forth above, the Plaintiff's Motion for Partial Summary Judgment [Doc. 268] is DENIED and the Defendants' Motion for Summary Judgment [Doc. 270] is GRANTED.  The Clerk is directed to enter judgment in favor of the FDM Defendants.  The Plaintiff is directed to file a Notice of Intention to Proceed as to any remaining Defendants within 10 days of the docketing of this Order.

SO ORDERED, this 20 day of April, 2006.

/s/Thomas W. Thrash
THOMAS W. THRASH, JR.
United States District Judge